UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

---

UNITED STATES OF AMERICA,

        *Plaintiff,*

    *vs*.                           Case No. 16-CR-177

TRAVIS KAMPS,

        *Defendant.*

---

## MOTION FOR COMPASSIONATE RELEASE

---

Travis Kamps, by counsel, moves under the First Step Act for resentencing. Given his health conditions and the threat that COVID-19 poses to his well-being, the defense respectfully requests a time-served sentence of incarceration, followed by five years of supervised release.

When the court sentenced Kamps in 2017, he had already been diagnosed with Alport Syndrome, a genetic disease affecting the blood vessels in one's kidneys that ultimately leads to kidney failure. At the time of sentencing, Kamps' older brother was undergoing dialysis three days per week and actively searching for a kidney transplant. As a result of the Alport Syndrome, Kamps also suffers from high blood pressure

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

Case 1:16-cr-00177-WCG   Filed 05/01/20   Page 1 of 33   Document 22

(hypertension) and high cholesterol. Kamps is currently housed at FCI-Elkton (Elkton) where he takes daily medication, Atorvastatin and Lisinopril, to address both of these. In June of 2019, the proteins in Kamps' urine were so high, they scheduled him to be seen at the Cleveland Clinic to determine whether his kidneys were failing and dialysis would be required. Kamps met with doctors in November of 2019 and although they determined his kidneys were not at the point where dialysis was needed, the Alport Syndrome had progressed. At that appointment, Kamps was also diagnosed as overweight/obese.

In ordinary times, Kamps would likely not be a strong candidate for compassionate release because he is only 28 years old and his conviction is for a sex offense. However, these are far from ordinary times. We are in the midst of an incredibly infectious pandemic that has a high fatality rate for people with a combination of comorbidities that includes hypertension, kidney disease, and obesity. Worse yet is Kamps' placement at Elkton. In a recent article appearing in the Business Journal Daily on April 22, 2020,[1]

---

[1] https://businessjournaldaily.com/judge-orders-elkton-prison-to-remove-vulnerable-inmates/

2

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

"Judge Orders Elkton Prison to Remove Vulnerable Inmates," the numbers illustrate how frightening things have become at Elkton:

> The Elkton prison houses about 2,400 inmates. As of Tuesday [April 21, 2020], the number of positive cases among staff members at the Federal Correctional Institution Elkton has increased to 46, up from 38 on Monday.
>
> According to data from the Federal Bureau of Prisons website, FCI Elkton has the highest number of staff cases among the affected 61 federal prisons and residential reentry centers in the country. It also has 52 positive inmate cases, with is the fourth highest number of inmates testing positive in federal prison.
>
> Of those inmates, 25 are hospitalized, 12 of whom are on ventilators, reported Joseph Mayle, union president at FCI Elkton. Another 100 inmates are currently quarantined with 50 in isolation.
>
> With six inmate deaths from COVID-19, Elkton is second only to the federal prison in Oakdale, La., where seven inmates have died from the virus, according to the prison bureau.[2]

While others are being considered for home confinement and furlough, Kamps is not solely because he is classified as a sex offender. Attorney General Barr's March 26, 2020 Memorandum and a latter DOJ memorandum from within the BOP specifically preclude sex offenders from being released to home confinement. A copy of both are attached as Exhibit

---

[2] Since that article was published, another inmate has died at FCI-Elkton which places them even with Oakdale, La. *See* https://www.bop.gov/coronavirus/

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

A. That means Kamps' only opportunity to be released is through a request for compassionate release.

## I.     BACKGROUND HISTORY

On April 21, 2017, Kamps was sentenced to the mandatory minimum 60 months imprisonment upon his plea of guilty to receipt of child pornography  contrary to 18 U.S.C. § 2252A(a)(2). Kamps was 25 years old at the time and his case involved a total of 5 videos on his cell phone that dated back to 2015/2016. Kamps never had in person contact with any of them and had stopped all conduct involving child pornography months before the investigators showed up to question him. Kamps was cooperative throughout the investigation and extremely remorseful for his conduct. He was placed on pre-trial release and never incurred any violations. He was granted self-surrender after sentencing in large part due to his medical condition that requires regular monitoring and his successful compliance with pre-trial release.

Kamps reported to Elkton on June 1, 2017. According to the BOP, his release date is August 27, 2021. Kamps has served just shy of 70% of his entire time if he were to remain in custody until his release date. Kamps has already been told by his case manager that he will be recommended for 11

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

months of halfway house time. That means Kamps will likely release to a halfway house by September 27, 2020. If you consider that as his "release date," he has served just shy of 90% of his term of incarceration.

While at Elkton, Kamps would be considered a model prisoner. Elkton is considered a low security facility and he was designated there from the beginning as this was his one and only offense. He has never had a single infraction the entire time there. Further, he successfully completed the non-residential sex offender treatment program in February 2019.

There is little need to spend too much time on COVID-19 and what this Court certainly knows—certain groups are at higher risk of death than others. Kamps already had concerns entering prison worrying about the progression of his disease. But with COVID-19, those fears and concerns are only heightened, especially when he is well aware that people at that institution are dying because of it. Kamps suffers from Alport Syndrome – a kidney disease – high blood pressure (hypertension), high cholesterol (hyperlipidemia), and obesity. He has many of the top conditions that make people highly vulnerable to severe illness, hospitalization, and death were he to contract the virus. His Alport Syndrome is definitely progressing as

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

the proteins in his urine continue to increase, signaling dialysis will be required soon.

Further, the situation at Elkton is dire. The latest numbers from Elkton of confirmed positives for COVID-19 as of April 29, 2020, are 49 inmates, 48 staff, and 7 deaths. It is second behind Oakdale, Louisiana, in number of deaths. They have been in lock down for weeks. This includes limited time out of their cells, no time outside, and eating bag lunches consisting of either bologna or peanut butter and jelly sandwiches for both lunch and dinner. For persons with Alport Syndrome, diet is key to continuing proper function of the kidneys. There can be little doubt that weeks of eating only bag lunches have had a negative impact on the overall function of his kidneys. With that background and perspective of how vulnerable Kamps is with his medical conditions, here are the legal mechanics of the motion and granting relief.

## II.     The Compassionate Release Analysis

The compassionate release statute authorizes the sentencing court to reduce a prisoner's sentence if: "(i) extraordinary and compelling reasons warrant such a reduction" or "(ii) the defendant is at least 70 years of age" and meets other criteria. 18 U.S.C. § 3582(c). In evaluating whether there are

6

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

extraordinary and compelling circumstances, the Court considers the policy statements of the sentencing guidelines. *See id.* If there is an extraordinary and compelling circumstance, then it consults the § 3553(a) factors to determine whether (and what) reduction is appropriate.

Ordinarily an inmate cannot seek compassionate release from the sentencing court until he satisfies 3582(c)(1)'s exhaustion requirement. The requirement is satisfied by either "fully exhaust[ing] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf *or the lapse of 30 days from the receipt of such a request by the warden.*" *Id.* § 3582(c)(1)(A) (emphasis added). Counsel has had limited contact with Kamps but can confirm that he did file a petition for compassionate release on April 18, 2020, and has received no response. The defense acknowledges that is less than 30 days ago. But non-jurisdictional exhaustion requirements like this one have exceptions. Here, those exceptions apply because the combination of Kamp's health conditions, the severe danger COVID-19 poses in the prison, and the fact that he is classified as a sex offender means he cannot wait to exhaust his BOP remedies without exposing himself to a grave, and possibly fatal, risk to his health.

7

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

### A. The exhaustion requirement is non-jurisdictional subject to exception.

There are two types of exhaustion requirements: one is jurisdictional; the other is a claim-processing rule. *See Bowles v. Russel*, 551 U.S. 205, 211–12 (2007) (noting "the jurisdictional distinction between court-promulgated rules and limits enacted by Congress"); *Fort Bend Cty., Texas v. Davis*, 139 S. Ct. 1843, 1849 (2019) ("The Court has therefore stressed the distinction between jurisdictional prescriptions and nonjurisdictional claim-processing rules, which seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times."). Jurisdictional preconditions cannot be waived or excused, but claim-processing rules can be. *Gonzalez v. Thaler*, 565 U.S. 134, 142 (2012) ("[s]ubject-matter jurisdiction can never be waived or forfeited"); *see Hamer v. Neighborhood Hous. Servs. of Chicago*, 138 S. Ct. 13, 17 (2017) ("Mandatory claim-processing rules are less stern."). And over the last decade, "the Supreme Court has taken new care to distinguish between truly (i.e., nonwaivable) jurisdictional rules and ordinary case-processing rules." *United States v. Taylor,* 778 F.3d 667, (7th Cir. 2015).

The Seventh Circuit has not directly addressed whether 3582(c)(1)'s exhaustion requirement is jurisdictional, but it has held that § 3582(c)'s

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

other exhaustion demands are non-jurisdictional: "§ 3582(c)(2)'s statutory criteria create a 'non-jurisdictional case processing rule' that does not deny district courts subject-matter jurisdiction." *Id.* at 66970. The Court continued on a point that bears on this case: "*That description applies equally to any § 3582(c)(2) motion.*" *Id.* (emphasis added). There is no reason to believe that subsection (c)(1) is jurisdictional, rather than a claim processing rule like (c)(2). In fact, the *Taylor* decision made two observations that bear on this question. First, "§ 3582 is not part of a jurisdictional portion of the criminal code but part of the chapter dealing generally with sentences of imprisonment." *Id.* at 671. And second, the court emphasized that subsection (c) as a whole is not phrased in jurisdictional terms. *Id.* at 671 ("Nor is subsection (c) phrased in jurisdictional terms. It begins: 'The court may not modify a term of imprisonment once it has been imposed," with exceptions then specified. *Since Congress has not framed the issue in terms of jurisdiction, the statutory indicators point against jurisdictional treatment.*'" (emphasis added)). Thus, the court's reasoning in *Taylor* governing the conclusion that (c)(2) is not jurisdictional applies equally to (c)(1).

Since § 3582(c)(1)'s exhaustion demand is a non-jurisdictional claim-processing rule, it is subject to certain exceptions. There are three

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

circumstances that allow a court to excuse a party's failure to exhaust his administrative remedies.

1) Exhaustion may be unnecessary where it would be futile, either because agency decision-makers are biased, the agency has already determined the issue, or the agency's standards preclude relief.

2) Exhaustion may be unnecessary where the administrative process would be incapable of granting adequate relief.

3) Exhaustion may be unnecessary where pursuing agency review would subject plaintiffs to undue prejudice.

*See Orr v. Assurant Employee Benefits,* 786 F.3d 596, 602 (7th Cir. 2015). In *Citadel Sec., LLC v. Chicago Bd. Options Exch., Inc.,* 808 F.3d 694, 700 (7th Cir. 2015), the court phrased the three generally accepted exceptions this way: "A district court can "waive a statutorily mandated exhaustion requirement," where exhaustion would be "futile," meaning that "the attempt to exhaust administrative remedies would be useless or inadequate to prevent irreparable harm." These exceptions are rooted in common sense and experience, as strict application of the exhaustion requirement can sometimes lead to absurd and altogether unfair results. To illustrate the point: "If it takes two weeks to exhaust a complaint that the complainant is

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

in danger of being killed tomorrow, there is no 'possibility of some relief' and so nothing for the prisoner to exhaust." *Fletcher v. Menard Correctional Center*, 623 F.3d 1171, 1174 (7th Cir. 2010).

In a case like Kamps', the typical reason cited for futility is the petitioner's health: "the ordeal of having to go through the administrative process may trigger a severe medical setback." *Bowen v. City of New York*, 476 U.S. 467, 483 (1986) (holding that irreparable injury justified waiving the exhaustion requirement); *Abbey v. Sullivan*, 978 F.2d 37, 46 (2d Cir. 1992) ("[I]f the delay attending exhaustion would subject claimants to deteriorating health, . . . then waiver may be appropriate."). Those health concerns, in fact, resonate in all three exceptions: "[U]ndue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile. Moreover, the relief the agency might provide could, because of undue delay, become inadequate. And finally, and obviously, [the defendant] could be unduly prejudiced by such delay." *Washington v. Barr*, 925 F.3d 109, 120–21 (2d Cir. 2019). After all, there are cases (like this one) "where a claimant's interest in having a particular issue resolved promptly is so great that deference to the agency's judgment is inappropriate." *Matthews v. Eldridge*, 424 U.S. 319, 330 (1976). Given the circumstances of an

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

unprecedented global pandemic, discussed above, and Kamps' health, even a few days delay carries the risk of catastrophic health consequences, especially for someone more vulnerable to the virus's effects.

Given this reality, it's futile for Kamps to ask the BOP for compassionate release (and wait for at least 30 days) all the while being exposed to a grave risk of serious illness and death. That futility satisfies the first exception to the exhaustion requirement. The publicized steps that the BOP has taken thus far hasn't alleviated the risk, and its internal compassionate release guidelines generally bar relief to inmates until they are actively and desperately unwell. Bureau of Prisons, *Program Statement 5050.50, Compassionate Release Procedures*, 4-7 (Jan. 17, 2019).[3] To be abundantly clear, given the rapidly changing situation and the various memos that have been released by the Bureau of Prisons, it is not clear how this operates in the wake of COVID-19. But for now, that guideline remains the only clear standard.

When it comes to the second exception, whether the administrative process is capable of granting adequate relief, this is a rapidly evolving situation. The just-passed CARES Act gives the Attorney General expanded authority to use home confinement to address the burgeoning catastrophe

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

inside the BOP. *See* Families Against Mandatory Minimums, *FAMM Responds to CARES Act Home Confinement Provision* (Mar. 26, 2020) (describing how the CARES Act increases the amount of time the BOP can place an inmate on home confinement).[3]  The BOP claims it has released over 1,000 people on home confinement but if you look at the numbers released compared to the numbers in prison, it equals less than ½ of 1%. See https://www.themarshallproject.org/2020/04/25/few-federal-prisoners-released-under-covid-19-emergency-policies. And for Kamps, release on home confinement under the CARES Act is not even possible. Even though the BOP has already released a number of individuals from Elkton who have served less time on their sentences and have no health concerns, all in an effort to alleviate the spreading of COVID-19, but not Kamps. Why? Because of Kamps status as a sex offender, the BOP will not consider him for release to home confinement under the CARES Act. *See* Exhibit A. So at this point, the administrative process is not capable of granting adequate relief to Kamps.

Thus, returning to this Court is Kamps only remedy. He needs to be released now—not at some undetermined future point, *after* he has been

---

[3] https://famm.org/famm-responds-to-cares-act-home-confinement-provision/.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

stricken by COVID-19. The BOP, under far better conditions, typically took months to address the requests of inmates. *See Bureau of Prisons Annual Report on Compassionate Release*, at ¶G (showing that non-terminal-illness compassionate release requests took on average between 58 and 117 days to be addressed by the BOP). With the current pandemic, the system is undoubtedly overwhelmed with new requests—a reality that will further bog down and delay the process. This all shows that the BOP will not or cannot grant the timely relief if Kamps were to exhaust the administrative procedures.

When it comes to the third exception, that can be folded into the first—in this case futility and undue prejudice march under the same banner: destroying his kidneys that are currently functioning, or worse yet, death. It should go without saying that "undue prejudice" means that what was supposed to be a five-year sentence could now be a death sentence— one that is much more likely avoided if (like the rest of the country) the defendant could exercise social distancing, proper hygiene, and get access to medical care *before* it's too late. *See United States v. Foster*, No. 1:14-cr-324- 02, Dkt. No. 191 (M.D. Pa. Apr. 3, 2020) (noting the "unprecedented" circumstances facing "our prison system" and finding that COVID-19 is an

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

extraordinary and compelling basis for release; indeed, "[n]o rationale is more compelling or extraordinary").

The news stories emerging from the prisons is disheartening, to say the least:

- Multiple inmate deaths at low-security FCI Oakdale in Louisiana. *See* Sadie Gurman, Zusha Elinson, & Deanna Paul, *Coronavirus Inside Oakdale Prison: 'Our Sentences Have Turned Into Death Sentences,'* Wall Street J. (Apr. 6, 2020)[4]

- Positive tests for BOP staff at least twenty different facilities. *See* Bureau of Prisons, *COVID-19 Coronavirus Information* (Apr. 6, 2020, 2:25 pm Central).[5]

- COVID-19 positive BOP inmates at  different facilities. *Id.*

- Federal Prisons Pose Imminent Danger in Spreading COVID-19, Union Says, A Complaint filed with OSHA cites hazards at 100 of the 122 facilities nationwide.[6]

The overall numbers in the BOP are frightening:  1534 inmates, 343 staff and 31 deaths from COVID-19. Many believe these numbers are under-reported. Not until this week did the BOP begin including numbers from

---

[4]https://www.wsj.com/articles/inside-oakdale-prison-our-sentences-have-turned-into-death-sentences11586191030.

[5] https://www.bop.gov/coronavirus/.

[6] https://www.govexec.com/oversight/2020/04/federal-prisons-pose-imminent-danger-spreadingcovid-19-union-says/164390/

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

the private prisons under the direction of the BOP.[7] And as recognized in both New York and Ohio, there is no doubt the numbers are likely much higher if all the BOP institutions were doing testing of all inmates and staff.[8]  Others believe it is a desire to simply keep their numbers down to make themselves look better.[9]  According to the BOP website, they update their numbers daily. However, as of April 29, 2020, they report no staff members deaths due to COVID-19. Robin Grubbs, a case worker at USP-Atlanta died of COVID-19 on April 20, 2020.[10]

Even if we accept the numbers reported by the BOP, the rate at which the numbers of those infected within the BOP are increasing are

---

[7] *See* https://www.newsobserver.com/news/local/article242181266.html

[8] *See* https://www.cleveland.com/open/2020/04/ohio-sen-rob-portman-decries-unacceptable-lack-of-coronavirus-testing-at-elkton-federal-prison.html;

 https://www.law360.com/articles/1259489/prison-says-it-tested-just-2-more-inmates-despite-virus-cases ( Only a few weeks ago,  the government conceded that in a hearing before a federal judge that MCC Brooklyn, it had only tested two inmates after the outbreak happened there. Frank G. Runyeon, *Prison Says it Tested Just 2 More Inmates Despite Virus Cases,* prompting one of the lawyers to state the obvious: "That's extremely alarming, your honor, . . . Because what that means is that the number of people who likely have the coronavirus there is exponentially higher.")

[9] https://www.miamiherald.com/news/local/crime/article241970091.html?utm_source=pushly&intcid=%7B__explicit:pushly_507484%7D

[10] *See* https://www.cbsnews.com/news/coronavirus-death-robin-grubbs-atlanta-federal-penitentiary-workers-criticize-covid-19-response/.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

even more staggering when compared to the rate of infection in the

general population where people can practice social distancing:

Rate of Rise of Reported COVID-19 Cases in Bureau of Prisons[11]

and the United States[12], Every 3 Days

| Date | Number of BOP Cases | BOP Rate of Rise | Cumulative BOP Rate of Rise Since 3/20/2020 | Number of National Cases | U.S. Rate of Rise | Cumulative U.S. Rate of Rise Since 3/20/2020 |
|------|------|------|------|------|------|------|
| 3/20/2020 | 2 | 0.00% | 0.00% | 18,747 | 0.00% | 0.00% |
| 3/23/2020 | 6 | 200.00% | 200.00% | 44,183 | 135.68% | 135.68% |
| 3/26/2020 | 18 | 200.00% | 400.00% | 85,356 | 93.19% | 228.87% |
| 3/29/2020 | 38 | 111.11% | 511.11% | 140904 | 65.08% | 293.95% |
| 4/1/2020 | 94 | 147.37% | 658.48% | 213144 | 51.27% | 345.21% |
| 4/4/2020 | 174 | 85.11% | 743.59% | 304826 | 43.01% | 388.23% |
| 4/7/2020 | 313 | 79.89% | 823.47% | 395011 | 29.59% | 417.81% |
| 4/10/2020 | 481 | 53.67% | 877.15% | 492,416 | 24.66% | 442.47% |
| 4/13/2020 | 589 | 22.45% | 899.60% | 579,005 | 17.58% | 460.06% |
| 4/16/2020 | 752 | 27.67% | 927.27% | 661,712 | 14.28% | 474.34% |
| 4/19/2020 | 804 | 6.91% | 934.19% | 746,625 | 12.83% | 487.17% |
| 4/22/2020 | 977 | 21.52% | 955.70% | 828,441 | 10.96% | 498.13% |
| 4/25/2020 | 1047 | 7.16% | 962.87% | 928,619 | 12.09% | 510.23% |
| 4/28/2020 | 1649 | 57.50% | 1020.37% | 981,246 | 5.67% | 515.89% |

---

[11] Numbers obtained from www.bop.gov/coronavirus on a daily basis. There is good reason to believe that the numbers reported by the BOP understate the actual number of tested-positive cases. *Compare* M. Licon-Vitale, MCC Ward, and D. Edge, MDC Warden, *Response to EDNY Administrative Order 2020-14* (Apr. 7, 2020) *at* https://www.nyed.uscourts.gov/pub/bop/MDC_20200407_042057.pdf (3 positive inmates at MDC Brooklyn) *with COVID-19 Cases* Federal Bureau of Prisons (Apr. 7, 2020) *at* www.bop.gov/coronavirus (2 positive inmates at MDC Brooklyn).

[12] Numbers obtained from https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html

FEDERAL DEFENDER SERVICES OF WISCONSIN, INC.

COVID-19 Rate of Infection for Various Populations

| Location | Cases | Population | Infections/ 1,000 People | Infection Rate as Percent of Population |
|---|---|---|---|---|
| BOP Population | 1,877[13] | 178,255[14] | 10.53 | 1.0530% |
| United States | 1,037,526[15] | 329,583,384[16] | 3.15 | 0.3148% |
| China | 83,940[17] | 1,394,015,977[18] | 0.06 | 0.0060% |
| Italy | 203,591[19] | 62,402,659[20] | 3.26 | 0.3263% |

| | BOP has an infection rate X times higher |
|---|---|
| Compared to the United States | 3.344944 |
| Compared to China | 174.8724 |
| Compared to Italy | 3.227506 |



COVID-19 Infections per 1,000 People

■ Bureau of Prisons ■ United States ■ China ■ Italy

10.53

3.15

0.06

3.26

Infections/ 1,000 People

---

[13] Includes the number of both BOP inmates and staff who have tested positive for COVID-19. Numbers obtained from www.bop.gov/coronavirus on a daily basis. There is good reason to believe that the numbers reported by the BOP understate the actual number of tested-positive cases. *Compare* M. Licon-Vitale, MCC Ward, and D. Edge, MDC Warden, *Response to EDNY Administrative Order 2020-14* (Apr. 7, 2020) *at* https://www.nyed.uscourts.gov/pub/bop/MDC_20200407_042057.pdf (3 positive inmates at MDC Brooklyn) *with COVID-19 Cases* Federal Bureau of Prisons (Apr. 7, 2020) *at* www.bop.gov/coronavirus (2 positive inmates at MDC Brooklyn).

[14] Includes the number of federal inmates in BOP-managed institutions and the BOP staff complement. Numbers obtained from www.bop.gov/coronavirus on a daily basis

[15] Numbers obtained on 4/29/2020 from https://coronavirus.jhu.edu/map.html

[16] Numbers obtained on 4/29/2020 from https://www.census.gov/popclock/

[17] Numbers obtained on 4/29/2020 from https://coronavirus.jhu.edu/map.html

[18] Numbers obtained on 4/29/2020 from https://www.census.gov/popclock/

[19] Numbers obtained on 4/29/2020 from https://coronavirus.jhu.edu/map.html

[20] Numbers obtained on 4/29/2020 from https://www.census.gov/popclock/

18

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

But more alarming is the information that is coming directly out of Ohio, and specifically Elkton:

- On April 6, 2020, appearing on the NBC local channel 21 in Ohio, *Senator Portman urges prisoners not to be transferred to FCI-Elkton.* https://www.wfmj.com/story/41979544/sen-portman-urges-prisoners-not-be-transferred-to-fci-elkton

- On April 28, 2020, at Cleveland.com, *Ohio Senator Portman decries unacceptable lack of coronavirus testing at Elkton Federal Prison.* https://www.cleveland.com/open/2020/04/ohio-sen-rob-portman-decries-unacceptable-lack-of-coronavirus-testing-at-elkton-federal-prison.html

- In CityBeat on April 28, 2020, *Feds Appeal Judge's Order to release Medically vulnerable inmates at Elkton* https://www.citybeat.com/news/blog/21130722/feds-appeal-judges-order-to-release-medically-vulnerable-inmates-at-elkton

- From The Business Journal Daily, April 30, 2020, *BOP Appeals Order to ID, Possibly Release Vulnerable Victims.* https://businessjournaldaily.com/bureau-of-prisons-appeals-order-to-id-possibly-release-vulnerable-elkton-inmates/

- *Ohio has Country's Largest Number of Confirmed Covid-19 Cases Behind Bars*, April 20, 2020. (There are over 3,300 confirmed cases within Ohio state prison system) https://radio.wosu.org/post/ohio-has-countrys-largest-number-confirmed-covid-19-cases-behind-bars#stream/0

These articles make clear that not nearly enough is being done by the BOP at Elkton to control the spread of COVID-19, to test the inmates and staff to

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

determine who has COVID-19, and finally to release those that are vulnerable:

> The warden of the Elkton Federal Correctional Institution and the director of the Federal Bureau of Prison Monday appealed to the U.S. Sixth Circuit Court the preliminary injunction handed down April 22 by U.S. Judge James S. Gwin that ordered Elkton officials to identify all medically vulnerable prisoners, and evaluate their eligibility for transfer out of the Columbiana County prison.

https://businessjournaldaily.com/bureau-of-prisons-appeals-order-to-id-possibly-release-vulnerable-elkton-inmates.

This is not the first case where a defendant has had to petition for compassionate release before he or she has had the opportunity to exhaust her claims. Recently in the wake of the COVID-19 crisis, other courts have recognized these exceptions and granted relief. Counsel has attached as Exhibit B a long list of cases finding exception to the exhaustion of administrative remedies. Most recently, the Court in *United States v. Coles*, 00CR20051, ECF No. 238(C.D. IL April 24, 2020)found an exception to the exhaustion of administrative remedies for Coles who was incarcerated at Elkton. In doing so, the court stated the following:

> …Conditions at FCI Elkton were recently addressed by the Northern District of Ohio after a group of inmates at FCI Elkton filed an emergency habeas action seeking release from Elkton due to the spread of COVID-19. The court ordered injunctive relief aimed at identifying vulnerable individuals' eligibility for transfer based on compassionate

20

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

release, parole or community supervision, transfer furlough, or non-transfer furlough. Inmates ineligible for compassionate release, home release, or parole or community supervision must be transferred to another BOP facility where more appropriate measures are in place. 3 Wilson, et al. v. Williams, et al., 4:20-cv-00794, d/e 22, p. 21 (N.D. Ohio April 22, 2020) ("while the deteriorating health conditions at Elkton pose a danger for each of the 2,400 men who are incarcerated at Elkton, the institution's inability to stop the spread of the virus among the inmates in its care poses an even greater risk for inmates whose medical conditions put them at higher risk of death if they contract the virus.").

The Court concludes that § 3582(c)(1)(A) does not require the Court to wait to consider a compassionate release request if there is a credible claim of serious and imminent harm from this pandemic. That does not mean the Court will waive the 30-day period in all cases. The decision must be made on a case-by-case basis. In this case, the Court finds that the 30-day requirement should be waived. The Court excuses Defendant Coles' failure to wait 30 days to seek relief pursuant to 18 U.S.C. § 3582(c)(1)(A).

*Id.* at 13-15. (Copy of Opinion is attached as Exhibit C). The same should be found as to Kamps who is currently housed at Elkton – exhaustion is not necessary in his case.

To summarize, the 30-day waiting period is not a jurisdictional bar to considering a compassionate-release claim. Rather, it is a claim-processing rule and like any claim processing rule, there are certain recognized exceptions that must apply in some cases.

Kamps only has to show that one of them applies to excuse the exhaustion requirement. Yet here, all three (futility, inability to grant relief,

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

and undue prejudice) independently and collectively justify waiving the 30-day requirement. Thus, the only question is whether Kamps' medical condition coupled with the threat of COVID-19 in the prisons presents an "extraordinary and compelling reason" justifying release.

## B. The extraordinary and compelling standard.

To grant a compassionate release motion, the Court must find "extraordinary and compelling" circumstances. Congress has never defined what constitutes "extraordinary and compelling." Instead, it delegated that to the Sentencing Commission. *See* 28 U.S.C. § 994(t). The Commission's recommendation appears in commentary to U.S.S.G. § 1B1.13 (the actual policy statement just repeats the statutory language), noting that "extraordinary and compelling reasons" may include medical conditions, age, family circumstances, and *other reasons*. *Id.* at app. n.1. The Commentary does not limit "other reasons," but says that it could be any "extraordinary and compelling reason other than, or in combination with" medical conditions, age, or family circumstances. *Id.* The Commission's statement was, however, formulated before the First Step Act passed, and since then it hasn't met to redefine or clarify what "extraordinary and

22

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

compelling" might mean. *United States v. Maumau,* 2020 WL 806121, at *1 n.3 (D. Utah Feb. 18, 2020).

Looking at the Commission's earlier statements, courts have regarded them as helpful but anachronistic: "the scope of the old policy statement is clearly outdated and, at the very least, does not apply to the entire field of post-First Step Act motions . . . . Therefore, the policy statement may provide 'helpful guidance' but does not limit the Court's independent assessment of whether 'extraordinary and compelling reasons' exist under § 3582(c)(1)(A)(i)." *United States v. Rodriguez,* No. 2:03-CR-00271-AB-1, 2020 WL 1627331, at *1 (E.D. Pa. Apr. 1, 2020); *see United States v. Fox,* , No. 2:14-CR-03-DBH, 2019 WL 3046086, at *3 (D. Me. July 11, 2019) ("I agree with the courts that have said that the Commission's existing policy statement provides helpful guidance [but] is not ultimately conclusive given the statutory change."). Thus, courts have found that they don't have to sit on their hands in situations like these and wait for the Commission to provide greater guidance. Instead, because the "statute's text directly instructs *courts* to 'find that' extraordinary circumstances exist," the court may determine what falls within those statutory terms. *Rodriguez,* 2020 WL 1627331, at *6 (emphasis in original); *see also United States v. Beck,* No. 1:13-CR-186-6, 2019 WL 2716505, at *7 (M.D.N.C. June 28, 2019) ("While the old policy statement

23

provides helpful guidance, it does not constrain the Court's independent assessment"); *United States v. Lisi*, No. 15 CR. 457 (KPF), 2020 WL 881994, at *3 (S.D.N.Y. Feb. 24, 2020). That is all to say, this Court makes the call on what qualifies (based on the facts presented) and it defines the terms "extraordinary and compelling" without any constraint beyond the statute's text.

When courts interpret a statute, it gives words their ordinary and accepted meaning. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning."). *Black's Law Dictionary* defines "extraordinary" as "[b]eyond what is usual, customary, regular, or common." *Black's Law Dictionary* (defining extraordinary) (11th ed. 2019). It defines "compelling need" as a "need so great that irreparable harm or injustice would result if it is not met." *Black's Law Dictionary* (defining Compelling Need) (11th ed. 2019). Taken together, they constitute the standard this Court should apply: the reason must be "beyond what is usual, customary, regular, or common," and the reasons must be "so great that irreparable harm or injustice would result if the relief is not granted." *See United States v. Cantu*, No. 1:05-CR-458-

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

1, 2019 WL 2498923, at *5 (S.D. Tex. June 17, 2019) (applying this approach with an older dictionary); *Beck,* 2019 WL 2716505, at *8 (same).

Thus, like other general terms, they are given life by both the statute's text and the facts that *other* cases have found to be extraordinary and compelling. In *Cantu,* it was the defendant's age. *Id.* In *Beck,* it was the defendant's breast cancer and the fact that "the quality of treatment BOP has provided Ms. Beck for her cancer has been abysmal." 2019 WL 2716505, at *7. In recent weeks, the list of what is extraordinary and compelling has expanded to additional health concerns and the ever-increasing risk of COVID-19 to the inmate's life.[21]  So, for instance, in *Gonzalez,* it was the

---

[21] *See, e.g.*, *United States v. Edwards*, No. 6:17-cr-3-NKM, R. 134 (Apr. 2, 2020) (granting compassionate release; "[h]ad the Court known when it sentenced Defendant in 2018 that the final 18 months of his term in federal prison would expose him to a heightened and substantial risk presented by the COVID-19 pandemic on account of Defendant's compromised immune system, the Court would not have sentenced him to the latter 18 months"); *United States v. Hernandez*, No. 18-cr-20474, R. 41 (S.D. Fla. Apr. 2, 2020) (granting unopposed motion for compassionate release for defendant with cancer and immunosuppression and just under 12 months left to serve on 39 month sentence); *Perez*, 2020 WL 1546422 (granting compassionate release where "[t]he benefits of keeping [Perez] in prison for the remainder of his sentence are minimal, and the potential consequences of doing so are extraordinarily grave"); *Rodriguez*, 2020 WL 1627331 (granting release after finding risk factors for COVID-19 constitute extraordinary and compelling reason and noting that prisons are "tinderboxes for infectious disease"); *United States v. Gonzalez*, No. 2:18-cr-232-TOR, R. 834 (E.D. Wash. Mar. 31, 2020) (releasing defendant one month into a 10 month sentence in light of medical issues; ordinarily these conditions would be manageable but "these are not ordinary times"); *United States v. Marin*, No. 15-cr-252, R. 1326 (E.D.N.Y. Mar. 30, 2020) ("[F]or the reasons stated in his motion, including his advanced age, significantly

25

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

defendant's age and health and "[because it is impossible to practice social distancing or isolation in a jail setting, the pandemic will be devastating when it reaches jail populations." *United States v. Gonzalez,* 18-CR-232, R.834 (E.D.WA March 31, 2020). In *United States v. Colvin,* 2020 WL 1613943,(D. Conn. Apr. 2, 2020), it was diabetes and the risk to those who contract COVID-19 with that condition and "the expectation that the COVID-19 pandemic will continue to grow and spread over the next several weeks, [that] the Court concludes that the risks faced by Defendant will be minimized by her immediate release to home." *Colvin, supra* at 6. Likewise,

---

deteriorating health, elevated risk of dire health consequences due to the current COVID-19 outbreak, status as a non-violent offender, and service of 80% of his original sentence."); *United States v. Muniz,* Case No. 4:09-cr-199, R. 578 (S.D. Tex. Mar. 30, 2020) (releasing defendant serving 188-month sentence for drug conspiracy in light of vulnerability to COVID-19: "[W]hile the Court is aware of the measures taken by the Federal Bureau of Prisons, news reports of the virus's spread in detention centers within the United States and beyond our borders in China and Iran demonstrate that individuals housed within our prison systems nonetheless remain particularly vulnerable to infection."); *United States v. Bolston,* Case No. 1:18-cr-382-MLB, R. 20 (N.D. Ga. Mar. 30, 2020) (releasing defendant in part because "the danger inherent in his continued incarceration at the R.A. Deyton Detention Facility . . . during the COVID-19 outbreak justif[y] his immediate release from custody"); *United States v. Powell,* No. 1:94-cr-316-ESH, R. 98 (D.D.C. Mar. 28, 2020) (granting unopposed motion for compassionate release in light of COVID-19 and finding it "would be futile" to require defendant to first exhaust in light of open misdemeanor case); *United States v. Campagna,* 2020 WL 1489829 (S.D.N.Y. Mar. 27, 2020) (compassionate release grant); *United States v. Barkman,* 2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020) (suspending intermittent confinement because "[t]here is a pandemic that poses a direct risk if Mr. Barkman . . . is admitted to the inmate population of the Wahoe County Detention Facility").

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

in *Rodriguez,* diabetes, liver disease, and hypertension put him in "a higher risk category." *Rodriguez, supra* at 14. After outlining the risk posed by COVID-19, the court in *Rodriguez* noted: "It is the confluence of COVID-19 and Mr. Rodriguez's health conditions that makes this circumstance extraordinary and compelling." *Id.* at 15. The list of examples could go on for pages (as the footnote above shows) and the cases are growing daily. The bottom line is that courts seem to agree with the common-sense proposition that a greatly increased risk of death given COVID-19 is an extraordinary and compelling reason.

While the government may argue that any defendant (like *any* person) will still be at risk on the outside, that argument misses the point: COVID-19 is deadly to them wherever it is contracted but the ability to guard against it is greater at home, where the defendant can quarantine. That can't happen at the prison. Indeed, the CDC's website says: "People in correctional and detention facilities are at greater risk for illnesses, such as COVID-19 because of their close living arrangements with other people."[22] Or, as one district judge put it last week, in the contest of granting a motion for

---

[22] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/faq.html; *see also* "With social distancing impossible, what do we do about inmates," MSNBC (Apr. 7, 2020), http://www.msnbc.com/morning-joe/social-distancing-impossible-what-do-we-do-about-inmates.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

compassionate release, prisons are "tinderboxes for infectious disease." *United States v. Rodriguez*, No. 2:03-cr-271-AB, Dkt. No. 135 (E.D. Pa. Apr. 1, 2020).

For Kamps, there can be no doubt that this pandemic, coupled with his health problems, meets the extraordinary and compelling criteria required for compassionate release. Pursuant to a court order, the BOP was required to put out a list of vulnerable inmates at Elkton and Kamps name was on it. *See* Exhibit D at 4. Kamps is literally trapped in an institution with 2377 other inmates and additional staff—unable to practice social distancing and unable to control his food production, sanitation or just about anything else. This pandemic has a distressingly high fatality rate for *people with serious medical conditions* – this includes people with high blood pressure, high cholesterol, obesity, and any disease that affects blood vessels.[23] Kamps suffers from Alport Syndrome which is a disease that damages the blood vessels in your kidneys.[24] Although Kamps is currently

---

[23] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fspecific-groups%2Fpeople-at-higher-risk.html; https://www.usnews.com/news/health-news/articles/2020-03-18/whos-most-at-risk-from-coronavirus

[24] https://www.kidney.org/atoz/content/alport

28

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

not undergoing dialysis, in June of 2019, his proteins in his urine had increased dramatically causing him to be brought outside of the institution to see a specialist to determine if he had reached the stage where dialysis was required. Thankfully, the answer in November was no, however they recommended he return in 6 months for a follow up. With COVID-19 right now and the quarantine that exists, Kamps is not going to be transferred off-site for a follow up. Studies have found that kidney disease is associated with high rates of death for hospitalized patients with coronavirus.[25]

Further, he does suffer from high blood pressure and high cholesterol, as well as obesity. In a very recent study of 5700 patients in the New York City area, the most common comorbidities linked to hospitalization for COVID-19 were high blood pressure (hypertension), obesity, and diabetes.[26] Further, it has been reported that young adults with

---

[25] https://www.kidney-international.org/article/S0085-2538(20)30255-6/fulltext. The study evaluated the association between abnormal kidney function and death in patients with COVID-19. "Results: Findings show the prevalence of kidney disease on admission and the development of AKI during hospitalization in patients with COVID-19 is high and is associated with in-hospital mortality."

[26] https://jamanetwork.com/journals/jama/fullarticle/2765184

29

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

no other comorbidities are more likely to be hospitalized simply if they suffer from obesity.[27]

Not surprisingly, the defense has not been able to find anything describing expected outcomes for a person with the combination of conditions Kamps suffers, especially because Alport Syndrome is a rare condition. But a number of studies show that a combination of comorbidities is associated with higher rates of fatalities. One study found that patients with at least one additional disease had a 79% greater chance of requiring intensive care or a respirator or both, or of dying. Two or more additional diseases increases that risk to 250%. Kamps has three additional diseases that put him at risk of severe COVID-19 illness. *See* Comorbidity and its impact on 1590 patients with COVID-19 in China: A Nationwide Analysis. Another study of COVID-19 patients dying in Italy reported a death rate of 1.2% for individuals with no comorbidities, and a death rate of 23.5% for one comorbidity, and a death rate of 26.6% for two comorbidities. The death rate for those with three of more comorbidities was 48.6%. *See* Characteristics of COVID-19 patients dying in Italy Report based on available data on March 20th, 2020. This means that with all the conditions

---

[27] https://www.nytimes.com/2020/04/16/health/coronavirus-obesity-higher-risk.html

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

Kamps suffers from, if he were to contract COVID-19, his risk of serious illness, hospitalization, and the risk to his kidneys failing leading to death could be as high as 40%. That certainly is extraordinary and compelling.

## III.    SECTION 3553(a) FACTORS

Given that § 3582 is a claim-processing rule and that grave risk to health qualifies as "extraordinary and compelling," then the Court has discretion to reduce the sentence for compassionate reasons, upon consideration of the § 3553(a) factors. *See* 18 U.S.C. § 3582(c)(1)(A); *see also* U.S.S.G. § 1B1.13(2) (beyond the need for an "extraordinary and compelling reason," instructing courts to determine whether "the defendant is not a danger to the safety of any other person or to the community"). In weighing those factors, the court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)." *Id.* § 3553(a)(2).

Looking at those here, there is little reason to keep Kamps in prison any longer. If Kamps were not a sex offender, he would have likely already been placed on home confinement by the BOP. Kamps has a solid release plan. He plans to return to his family home in Seymour and live with his parents, Vicki and Kevin. This is the same home he lived in with his parents

31

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

during his time on pre-trial release so it is a home that has already been approved by probation in the past. Kamps will have his own room upstairs away from the other family members and therefore, able to quarantine himself and not put other family members at risk if were to be released from Elkton.

Further, Kamps intends to go back to work at his father's business, Statewide Building Services. They have projects they are working on and as soon as he finishes his 14 day quarantine, he can start working. His family is extremely supportive and have made frequent visits to Elkton to visit with Kamps. They will do whatever is required to have him home and safe with them, including compliance with any type of home confinement or location monitoring requirements. In addition, at home Kamps has the ability to meet with the family Nephrologist that has provided care to his brothers and him for the past ten plus years.

Finally, there is little concern that he'd re-offend. Regardless of the public perception, the recidivism rates for non-contact sex offenders are quite low. Kamps successfully completed the BOP sex offender treatment program and will be on supervised release and have to comply with all conditions required of sex offenders on release. If the court is inclined to do

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

so, additional conditions can be placed on Kamps including location monitoring or other computer monitoring requirements. Kamps will also have to abide by all requirements of the Sex Offender Registration and Notification Act. Thus, while society can be safe with Kamps at home, he is not safe at Elkton and given his medical conditions it may very well equate a COVID-19 diagnosis with grave results for Kamps.

## IV. CONCLUSION

Based on the extraordinary and compelling circumstances of this case, Kamps asks the Court to reduce his sentence to "time served" under § 3582(b)(1)(A) and have him begin his term of supervised release upon his release, subject to conditions already in place and any new ones the court deems necessary.

Dated at Green Bay, Wisconsin this 30th day of April, 2020.

Respectfully Submitted

 s/ Krista Halla-Valdes
Krista Halla-Valdes, FL Bar # 073369
Attorney for Travis Kamps
Federal Defender Services of WI, Inc.
801 East Walnut Street, 2nd Floor
Green Bay, Wisconsin 54301-4401
Tel: 920-430-9900
Fax: 920-430-9901
krista_halla-valdes@fd.org

33